**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NEW YORK CITY EMPLOYEES'
RETIREMENT SYSTEM, NEW YORK CITY
POLICE PENSION FUND, BOARD OF
EDUCATION RETIREMENT SYSTEM OF THE
CITY OF NEW YORK, TEACHERS'
RETIREMENT SYSTEM OF THE CITY OF
NEW YORK, NEW YORK CITY FIRE
DEPARTMENT PENSION FUND, NEW YORK
CITY DEFERRED COMPENSATION PLAN, and
FÖRSTA AP-FONDEN,

       Plaintiffs,

       v.

PETRÓLEO BRASILEIRO S.A.-PETROBRAS,
PETROBRAS GLOBAL FINANCE B.V., MARIA
DAS GRAÇAS SILVA FOSTER, JOSÉ SERGIO
GABRIELLI DE AZEVEDO, ALMIR
GUILHERME BARBASSA, DANIEL LIMA DE
OLIVEIRA, JOSÉ RAIMUNDO BRANDÃO
PEREIRA, SÉRVIO TÚLIO DA ROSA TINOCO,
PAULO JOSÉ ALVES, GUSTAVO TARDIN
BARBOSA, ALEXANDRE QUINTÃO
FERNANDES, MARCOS ANTONIO
ZACARIAS, CORNELIS FRANCISCUS JOZEF
LOOMAN, THEODORE MARSHALL HELMS,
BB SECURITIES LTD., CITIGROUP GLOBAL
MARKETS INC., ITAÚ BBA USA SECURITIES,
INC., J.P. MORGAN SECURITIES LLC,
MORGAN STANLEY & CO. LLC, MITSUBISHI
UFJ SECURITIES (USA), INC., HSBC
SECURITIES (USA) INC., MERRILL LYNCH,
PIERCE, FENNER & SMITH INCORPORATED,
STANDARD CHARTERED BANK, BANK OF
CHINA (HONG KONG) LIMITED, BANCO
BRADESCO BBI S.A., BANCA IMI S.P.A., and
SCOTIA CAPITAL (USA) INC.,

       Defendants.

No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

I.    NATURE OF ACTION ........................................................................................... 1

II.   FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS ................................... 3

III.  RELEVANT SECURITIES ...................................................................................... 5

    A.   PETROBRAS EQUITY .................................................................................. 5

    B.   PETROBRAS DEBT – THE 2012 NOTES ....................................................... 5

    C.   PETROBRAS DEBT – THE 2013 AND 2014 NOTES ....................................... 6

IV.   PARTIES ............................................................................................................ 8

    A.   PLAINTIFFS .............................................................................................. 8

    B.   SECURITIES ACT DEFENDANTS ................................................................. 9

        1.   The Company ................................................................................ 9

        2.   CEO Gabrielli ............................................................................. 10

        3.   The Officer And Director Defendants ........................................... 10

        4.   The Underwriter Defendants......................................................... 11

    C.   EXCHANGE ACT DEFENDANTS ................................................................. 14

V.    JURISDICTION AND VENUE .............................................................................. 14

VI.   SUMMARY OF SUBSTANTIVE ALLEGATIONS..................................................... 16

    A.   BACKGROUND OF PETROBRAS.................................................................. 16

    B.   A BRIBERY SCANDAL ENGULFS PETROBRAS ............................................ 16

        1.   Operation Car Wash Uncovers An Enormous Bribery Scheme
            Implicating Top Petrobras Officials........................................... 16

        2.   An Independent Member Of The Petrobras Board Votes Against
            Approval Of The Company's 2013 Financial Statements.............. 19

        3.   The Abreu e Lima Refinery And Other Major Projects Are
            Implicated In The Fraud ............................................................. 20

        4.   Petrobras' Most Senior Executives Knew Of The Fraud............... 21

        5.   Petrobras Is Subject To Far-Ranging Investigations..................... 22

    C.   PETROBRAS ADMITS THAT THE BRIBERY SCHEME CAUSED ITS ASSET
        VALUATIONS TO BE INFLATED .................................................................. 23

    D.   PETROBRAS' AUDITOR REFUSES TO APPROVE ITS FINANCIAL STATEMENTS
        FOR THE THIRD QUARTER OF 2014 DUE TO CONCERNS OVER THE BRIBERY
        SCHEME .................................................................................................. 28

    E.   PETROBRAS MANAGEMENT RESIGNS *EN MASSE* .................................... 29

VII.  PETROBRAS' VIOLATIONS OF ACCOUNTING STANDARDS ............................. 29

|   | A. | 2009-2010 – US GAAP VIOLATIONS | 30 |
|   | B. | 2011-2014 – IFRS VIOLATIONS | 32 |
| VIII. | | DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS | 36 |
|   | A. | FALSE STATEMENTS AND OMISSIONS RELEVANT TO EXCHANGE ACT CLAIMS | 36 |
|   | 1. | March 24, 2010 – Press Release And Analyst Conference Call Announcing 2009 Financial Results | 36 |
|   | 2. | May 20, 2010 – 2009 Form 20-F | 38 |
|   | 3. | May 27, 2010 – Press Release Announcing Financial Results For The First Quarter Of 2010 | 40 |
|   | 4. | August 24-25, 2010 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2010 | 40 |
|   | 5. | November 23, 2010 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2010 | 41 |
|   | 6. | March 15, 2011 – Press Release Announcing 2010 Financial Results | 42 |
|   | 7. | May 24, 2011 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2011 | 43 |
|   | 8. | May 26, 2011 – 2010 Form 20-F | 43 |
|   | 9. | June 6, 2011 – 2010 Sustainability Report | 44 |
|   | 10. | August 14, 2011 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2011 | 44 |
|   | 11. | November 22, 2011 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2011 | 45 |
|   | 12. | February 3, 2012 – Prospectus Supplement Offering The 2012 Notes | 46 |
|   | 13. | February 28, 2012 – Press Release And Form 6-K Announcing 2011 Financial Results | 46 |
|   | 14. | April 2, 2012 – 2011 Form 20-F | 47 |
|   | 15. | May 15, 2012 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2012 | 47 |
|   | 16. | June 21, 2012 – 2011 Sustainability Report | 48 |
|   | 17. | August 3, 2012 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2012 | 49 |
|   | 18. | August 29, 2012 – 2012 Registration Statement | 50 |
|   | 19. | October 26, 2012 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2012 | 51 |

20. February 4, 2013 – Press Release And Form 6-K Announcing 2012 Financial Results .................................................................................. 51

21. April 26, 2013 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2013 ................................... 52

22. April 29, 2013 – 2012 Form 20-F .................................................... 53

23. May 15, 2013 – Prospectus Supplement For The 2013 Notes ............... 53

24. May 2013 – 2012 Sustainability Report .................................................. 54

25. August 9, 2013 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2013 .............................. 55

26. October 25, 2013 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2013 .............................. 56

27. February 25, 2014 – Press Release And Form 6-K Announcing 2013 Financial Results ........................................................................ 56

28. March 11, 2014 – Prospectus Supplement For 2014 Notes ..................... 58

29. April 30, 2014 – 2013 Form 20-F ......................................................... 59

30. May 2014 – 2013 Sustainability Report ................................................. 59

31. May 9, 2014 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2014 ................................................. 61

32. August 8, 2014 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2014 .............................. 62

B. FALSE STATEMENTS RELEVANT TO SECURITIES ACT CLAIMS ............................... 62

1. False Statements And Omissions In The Offering Documents For The 2013 Notes ....................................................................................... 62

2. False Statements And Omissions In The Offering Documents For The 2014 Notes ....................................................................................... 63

IX. THE TRUTH EMERGES, LEADING TO LARGE DECLINES IN THE PRICES OF PETROBRAS SECURITIES ............................................................................... 64

X. THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER .......................... 82

A. PETROBRAS, PIFCO AND PGF .................................................................... 82

B. GABRIELLI .................................................................................................. 84

C. FOSTER ...................................................................................................... 85

D. BARBASSA .................................................................................................. 86

XI. PLAINTIFFS RELIED UPON DEFENDANTS' MISREPRESENTATIONS TO PLAINTIFFS' DETRIMENT .......................................................................... 86

A. PRESUMPTION OF RELIANCE: THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ................................................................................ 88

     B.     No Safe Harbor .................................................................................................. 90

XII.    PLAINTIFFS HAVE SUFFERED LOSSES AS A RESULT OF THEIR PURCHASES OF PETROBRAS SECURITIES ............................................................. 90

XIII.   CAUSES OF ACTION ..................................................................................................... 91

PRAYER FOR RELIEF ............................................................................................................. 100

JURY TRIAL DEMANDED ....................................................................................................... 100

Plaintiffs the New York City Employees' Retirement System; the New York City Police Pension Fund; the Board of Education Retirement System of the City of New York; the Teachers' Retirement System of the City of New York; the New York City Fire Department Pension Fund; the New York City Deferred Compensation Plan (collectively, the "NYC Funds"); and Första AP-Fonden ("AP1") (together with the NYC Funds, "Plaintiffs"), by and through their undersigned counsel, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters. Plaintiffs' allegations are based on the investigation conducted by Plaintiffs' undersigned attorneys, which included, among other things: (1) review and analysis of documents filed with the United States Securities and Exchange Commission ("SEC") by Petróleo Brasileiro S.A.-Petrobras ("Petrobras" or the "Company") and its wholly-owned subsidiaries Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF"); (2) review and analysis of press releases and reports issued by and disseminated by Petrobras; (3) review of media coverage of Petrobras; and (4) review of other publicly available information concerning Petrobras. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF ACTION

1. This action is brought pursuant to the Securities Exchange Act of 1934 (the ("Exchange Act") and the Securities Act of 1933 (the "Securities Act"). Plaintiffs purchased or otherwise acquired the securities of Petrobras, including debt securities issued by PifCo and PGF, on the New York Stock Exchange (the "NYSE") between March 24, 2010 and March 19, 2015, inclusive (the "Relevant Period").

2. Plaintiffs' Exchange Act claims allege that certain Defendants engaged in a fraudulent scheme that artificially inflated the price of Petrobras securities, including the debt

securities issued by PifCo and/or PGF, during the Relevant Period. Plaintiffs' Exchange Act claims are brought in connection with Petrobras debt securities and American Depositary Shares ("ADS"). Petrobras common ADS trade on the NYSE under the symbol PBR, and its preferred ADS trade on the NYSE under the symbol PBR/A.

3.     Plaintiffs' Securities Act claims are based solely on strict liability and negligence, and not upon any reckless or intentionally fraudulent conduct by or on behalf of Defendants. These claims do not allege, arise from, or sound in, fraud. Plaintiffs specifically disclaim any allegation of fraud, scienter, or recklessness with respect to their Securities Act claims.

4.     Plaintiffs' Securities Act claims are brought in connection with certain debt securities issued by PifCo and/or PGF pursuant and/or traceable to two public offerings registered in the United States. In a debt offering on or about May 15, 2013 (the "2013 Offering"), PGF sold approximately $11 billion in notes at six sets of interest rate and maturity terms (the "2013 Notes"). PGF sold approximately $8.5 billion in notes (the "2014 Notes" and together with the 2013 Notes, the "Notes") at six sets of interest rate and maturity terms in a second debt offering on or about March 11, 2014 (the "2014 Offering" and, together with the 2013 Offering, the "Offerings").

5.     The claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information made by Defendants throughout the Relevant Period, concerning: (1) the value of Petrobras' assets; (2) the Company's periodic expenses and net income, (3) the Company's anti-bribery and anti-corruption policies; and (4) whether the Company suffered from material weaknesses in its disclosure controls and procedures and internal controls over financial reporting. When the truth about these matters was revealed

through a series of corrective disclosures, the market value of Petrobras, PifCo and PGF securities purchased by Plaintiffs declined sharply, causing Plaintiffs to suffer losses.

## II.    FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS

6.    This case revolves around a prolonged, pervasive, multi-billion dollar bribery scheme involving top Petrobras executives, major contractors, and corrupt officials of the Brazilian government (which is Petrobras' controlling shareholder). Beginning around 2005 and continuing into the Relevant Period, the Company engaged in a scheme whereby contractors paid bribes to Petrobras executives and others in exchange for the award of lucrative oil and gas construction contracts. Some of the bribes were passed on to Brazilian politicians and political parties. Petrobras then paid the contractors inflated amounts under the contracts in order to repay them for the bribes. According to a money launderer who participated in the scheme, and whose testimony has been central to the Brazilian police investigation, both Petrobras' CEO and the current President of Brazil (who was the Chairman of the Company from 2003 to 2010) knew of and understood the scheme. When the fraud was finally revealed beginning in May 2014, it sent shock waves through the Brazilian government and economy, and caused Petrobras' market capitalization to plummet.

7.    Throughout the Relevant Period, the Company specifically, unequivocally and repeatedly denied that it was involved in any corrupt practices, claiming that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that the Company "is not involved in corruption." These statements were material to investors who were concerned about the potential for impropriety given the close relationship between the Brazilian government and the Company.

8.    Furthermore, Petrobras capitalized its bribery-related payments, treating them as costs related to the development of oil and gas infrastructure and recording them on the

3

Company's balance sheet as representing part of the value of the acquired assets. Petrobras then used the bribery-inflated asset values in calculating depreciation expenses and net income. Yet, during the Relevant Period, Petrobras asserted that it prepared its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP") or International Financial Reporting Standards ("IFRS"), claiming that its assets had values equal to the reported costs incurred in their acquisition or construction.

9. Petrobras' reported asset values were important information for Plaintiffs and other purchasers of the Petrobras, PifCo, and PGF securities because these metrics were understood to represent the fair value of the Company's fixed assets. Market participants including rating agencies, analysts and investors relied upon the accuracy of these figures.

10. Petrobras has publicly acknowledged that its fixed asset values must be written down to remove the fraudulent inflation discussed above, although it has not yet stated the amount of the writedown that it will take. It is expected to be in the billions of U.S. dollars.

11. Throughout the Relevant Period, Petrobras issued public statements, including financial statements filed with the SEC, setting forth, among other things: (1) the Company's asset values; (2) the Company's periodic expenses and net income; (3) statements regarding the Company's anti-corruption policies and practices; and (4) certifications that the Company did not suffer from a material weakness in its disclosure controls and procedures or its internal controls over financial reporting.

12. These statements were false, in that: (1) the Company's asset values had been inflated by the fraudulent practice of incorporating bribe-related expenses to contractors when capitalizing asset values on the Company's balance sheet, violating GAAP and IFRS; (2) the Company's expenses were understated and its income overstated due to its practice of

capitalizing bribe-related expenses (rather than expensing them); (3) the Company was involved in corrupt practices and did make payments to political candidates; and (4) the Company suffered from material weaknesses in its disclosure controls and internal controls over financial reporting. As a result of these false statements, the prices of Petrobras securities were artificially inflated during the Relevant Period.

13.     As a result of Defendants' materially false and/or misleading statements and omissions: (1) Petrobras, PifCo, and PGF securities traded at artificially inflated prices during the Relevant Period; and (2) Plaintiffs purchased those securities at artificially inflated prices. However, when the truth about these matters became known to investors, the price of Petrobras, PifCo, and PGF securities fell. These price declines caused significant losses and damages to Plaintiffs.

## III.    RELEVANT SECURITIES

14.     Petrobras was incorporated in 1953 to conduct the Brazilian government's hydrocarbon business. While the Company has been opened to private equity ownership, the Brazilian government still owned 28.67% of its outstanding capital stock and 50.26% of its voting shares as of December 31, 2013. It is involved in hydrocarbon-related businesses including exploration, development, production, refining, logistics, transportation, and trading, as well as production of biofuels.

### A.    PETROBRAS EQUITY

15.     During the Relevant Period, Petrobras common and preferred ADS were listed on the NYSE. Each Petrobras ADS represents two shares of common or preferred stock.

### B.    PETROBRAS DEBT – THE 2012 NOTES

16.     During the Relevant Period, Petrobras sold debt to investors through its wholly-owned finance subsidiaries PGF and PifCo. On December 11, 2009, Petrobras and PifCo filed a

5

registration statement on Form F-3ASR (the "2009 Registration Statement"), whereby they registered "an indeterminate amount of securities for offer and sale from time to time at indeterminate offering prices." The 2009 Registration Statement states that "[w]e have agreed that New York law governs the indenture and the debt securities. We have filed a copy of the Petrobras indenture and PifCo indenture with the SEC as exhibits to our registration statement. We have consented to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the City of New York, New York . . . ."

17. On February 3, 2012, PifCo filed a prospectus supplement on Form 424B2 (the "2012 Prospectus" and together with the 2009 Registration Statement, the "2012 Offering Documents") for the offer and sale of $7 billion in debt securities in four different series of notes, pursuant to the 2009 Registration Statement.

18. The 2012 Offering Documents offered four series of notes: (1) a $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 (CUSIP 71645WAR2); (2) a $1.25 billion re-opening of notes first offered on January 27, 2011 paying 6.750% due in 2041 (CUSIP 71645WAS0); (3) $1.25 billion of notes paying 2.875% due in 2015 (CUSIP 71645WAV3); and (4) $1.75 billion of notes paying 3.500% due in 2017 (CUSIP 71645WAU5) (collectively, the "2012 Notes").

C.   **PETROBRAS DEBT – THE 2013 AND 2014 NOTES**

19. On August 29, 2012, Petrobras, PifCo, and PGF filed a registration statement on Form F-3ASR (the "2012 Registration Statement"), whereby they again registered "an indeterminate amount of securities for offer and sale from time to time at indeterminate offering prices." The 2012 Registration Statement states that, "We have agreed that New York law governs the indenture and the debt securities. We have filed a copy of the Petrobras, PifCo and PGF indentures as exhibits to our registration statement. We have consented to the non-

exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the City of New York, New York . . . ." The 2012 Registration Statement included a prospectus that expressly incorporated by reference the following documents, amongst others:

a) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011, filed with the SEC on March 30, 2012, and its amendment on Form 20-F/A, filed with the SEC on July 9, 2012;

b) the Petrobras Report on Form 6-K filed with the SEC on August 10, 2012, containing financial information for the six-month periods ended June 30, 2012 and 2011; and

c) "Any future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus . . . ."

20. On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 (the "2013 Prospectus" and together with the 2012 Registration Statement, the "2013 Offering Documents") for the offer and sale of $11 billion in debt securities in six different series of notes, pursuant to the 2012 Registration Statement.

21. The 2013 Offering Documents offered six series of notes: (1) $1.25 billion of notes paying 2.00% due in 2016 (CUSIP 71647NAC3); (2) $2 billion of notes paying 3.00% due in 2019 (CUSIP 71647NAB5); (3) $3.5 billion of notes paying 4.375% due in 2023 (CUSIP 71647NAF6); (4) $1.75 billion of notes paying 5.625% due in 2043 (CUSIP 71647NAA7); (5) $1 billion of floating-rate notes due in 2016 (CUSIP 71647NAD1); and (6) $1.5 billion of floating-rate notes due in 2019 (CUSIP 71647NAE9).

22.    On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 (the "2014 Prospectus" and together with the 2012 Registration Statement, the "2014 Offering Documents") for the offer and sale of $8.1 billion of debt securities in six different series of notes, pursuant to the 2012 Registration Statement.

23.    The 2014 Offering Documents offered six series of notes: (1) $1.6 billion of notes paying 3.250% due in 2017 (CUSIP 71647NAG4); (2) $1.5 billion of notes paying 4.875% due in 2020 (CUSIP 71647NAH2); (3) $2.5 billion of notes paying 6.250% due in 2024 (CUSIP 71647NAM1); (4) $1 billion of notes paying 7.250% due in 2044 (CUSIP 71647NAK5); (5) $1 billion of floating-rate notes due in 2017 (CUSIP 71647NAJ8); and (6) $500 million of floating-rate notes due in 2020 (CUSIP 71647NAL3).

24.    The notes issued by PGF and PifCo are fully and unconditionally guaranteed by Petrobras.

IV.    PARTIES

   A.    PLAINTIFFS

25.    Plaintiff NYC Funds consists of the following six funds: the New York City Employees' Retirement System ("NYCERS"); the New York City Police Pension Fund ("Police"); the Board of Education Retirement System of the City of New York ("BERS"); the Teachers' Retirement System of the City of New York ("TRS"); New York City Fire Department Pension Fund ("Fire"); and the New York City Deferred Compensation Plan ("DCP"). As of March 20, 2015, the Funds had more than 300,000 retired members.

26.    The NYC Funds made purchases of Petrobras common ADS, preferred ADS, 2012 Notes (CUSIP 71645WAR2), 2013 Notes (CUSIPS 71647NAA7, 71647NAF6), and 2014 Notes (CUSIPS 71647NAH2, 71647NAK5, 71647NAM1) at artificially inflated prices during the Relevant Period in this District and suffered damages thereby.

27.    Plaintiff AP1 is a pension fund for every person who is, or has been, employed in Sweden. One of Sweden's largest pension managers, with net assets of approximately SEK 267 billion as of June 2014, AP1 invests in equities, fixed income securities, foreign exchange and alternative investments worldwide. AP1 made purchases of Petrobras common ADS and preferred ADS at artificially inflated prices during the Relevant Period and suffered damages thereby.

## B.    SECURITIES ACT DEFENDANTS

### 1.    The Company

28.    Defendant Petrobras is a corporation organized under Brazilian law. Its principal executive offices are located at Avenida República do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil. Petrobras also has an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.

29.    Defendant PGF is a wholly-owned finance subsidiary of Petrobras incorporated in The Netherlands. Its principal executive offices are located at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.

30.    PifCo was a wholly-owned finance subsidiary of Petrobras. Between the beginning of the Relevant Period and August 9, 2013, PifCo was incorporated in the Cayman Islands with its principal executive offices located at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box I 034GT-BWI, George Town, Grand Cayman, Cayman Islands. On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with principal executive offices at 40, Avenue Monterey, 2163 Luxembourg. On December 16, 2013, certain assets and liabilities of PifCo were spun off to Petrobras. On February 12, 2014, PGF acquired the outstanding shares of PifCo as an initial step for the merger of PifCo into PGF. On December 29, 2014, the merger of PifCo into PGF was completed and PifCo's separate corporate

existence was extinguished. All allegations against PifCo are made against PGF as the corporate successor of PifCo.

### 2.   CEO Gabrielli

31.    Defendant José Sergio Gabrielli de Azevedo ("Gabrielli") served as Chief Executive Officer ("CEO") of Petrobras during the Relevant Period, and signed the 2009 and 2010 Forms 20-F. Gabrielli resigned as CEO on or around January 23, 2012.

### 3.   The Officer And Director Defendants

32.    Defendant Maria das Graças Silva Foster ("Foster") served as CEO of Petrobras during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2011, 2012, and 2013 Forms 20-F. Foster resigned as CEO on or around February 4, 2015.

33.    Defendant Almir Guilherme Barbassa ("Barbassa") served as Chief Financial Officer ("CFO") of Petrobras during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, 2012, and 2013 Forms 20-F.

34.    Defendant Daniel Lima de Oliveira ("Oliveira") served as CEO and Chairman of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, and 2012 Forms 20-F.

35.    Defendant José Raimundo Brandão Pereira served as a Director of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

36.    Defendant Sérvio Túlio da Rosa Tinoco ("Tinoco") served as CFO of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, and 2012 Forms 20-F.

37.    Defendant Paulo José Alves served as the Chief Accounting Officer of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

38.    Defendant Gustavo Tardin Barbosa served as CEO and Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

39.    Defendant Alexandre Quintão Fernandes served as CFO and Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

40.    Defendant Marcos Antonio Zacarias served as a Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

41.    Defendant Cornelis Franciscus Jozef Looman served as a Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

42.    Defendant Theodore Marshall Helms ("Helms") serves as the authorized U.S. Representative for Petrobras and PGF, and served as the authorized U.S. Representative for PifCo during the Relevant Period.   Helms signed the prospectus included in the 2012 Registration Statement.

43.    The Defendants listed in ¶¶32-42 are referred to as the "Officer and Director Defendants."

### 4.    The Underwriter Defendants

44.    Defendant Banca IMI S.p.A. ("Banca IMI") acted as an underwriter and co-manager of the 2014 Notes offering as set forth in the table below.  Banca IMI maintains its

11

principal place of business in Milan, Italy, and its subsidiary Banca IMI Securities Corporation maintains an office in New York City.

45.     Defendant Banco Bradesco BBI S.A. ("Bradesco") acted as an underwriter and joint bookrunner of the 2014 Notes offering as set forth in the table below. Bradesco maintains its principal place of business in São Paulo, Brazil, and maintains an office in New York City.

46.     Defendant Bank of China (Hong Kong) Limited ("Bank of China") acted as an underwriter and joint bookrunner of the 2014 Notes offering as set forth in the table below. Bank of China maintains its principal place of business in Hong Kong.

47.     Defendant BB Securities Ltd. ("BB Securities") acted as an underwriter and joint bookrunner of the each of the Notes offerings at issue as set forth in the table below. BB Securities is a subsidiary of Banco do Brasil S.A. incorporated in the United Kingdom with its principal place of business located in London. Its parent corporation, Banco de Brasil S.A. maintains an office in New York City.

48.     Defendant Citigroup Global Markets Inc. ("Citigroup") acted as an underwriter and joint bookrunner of each of the Notes offerings at issue as set forth in the table below. Citigroup maintains its principal place of business in New York City.

49.     Defendant HSBC Securities (USA) Inc. ("HSBC") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes and 2014 Notes as set forth in the table below. HSBC maintains its principal place of business in New York City.

50.     Defendant Itaú BBA USA Securities, Inc. ("Itaú") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes as set forth in the table below. Itaú maintains its principal place of business in New York City.

51. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as an underwriter and joint bookrunner of each the Notes offerings at issue as set forth in the table below. J.P. Morgan maintains its principal place of business in New York City.

52. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as an underwriter and joint bookrunner of the 2013 Notes offering as set forth in the table below. Merrill Lynch maintains its principal place of business in New York City.

53. Defendant Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") acted as an underwriter and co-manager of the offerings of the 2013 Note as set forth in the table below. Mitsubishi maintains an office in New York City.

54. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes as set forth in the table below. Morgan Stanley maintains its principal place of business in New York City.

55. Defendant Scotia Capital (USA) Inc. ("Scotia Capital") acted as an underwriter and co-manager of the 2014 Notes offering as set forth in the table below. Scotia Capital maintains its principal place of business in New York City.

56. Defendant Standard Chartered Bank ("Standard Chartered") acted as an underwriter and co-manager of the 2013 Notes offering as set forth in the table below. Standard Chartered maintains its principal place of business in the United Kingdom, and maintains an office in New York City.

| Defendant | Role(s) | Offerings |
|---|---|---|
| Banca IMI | Underwriter Co-Manager | 2014 Notes |
| Bank of China | Underwriter Joint Bookrunner | 2014 Notes |
| BB Securities | Underwriter Joint Bookrunner | 2013 Notes 2014 Notes |
| Bradesco | Underwriter Joint Bookrunner | 2014 Notes |
| Citigroup | Underwriter Joint Bookrunner | 2013 Notes 2014 Notes |
| HSBC | Underwriter Joint Bookrunner | 2013 Notes 2014 Notes |
| Itaú | Underwriter Joint Bookrunner | 2013 Notes |
| J.P. Morgan | Underwriter Joint Bookrunner | 2013 Notes 2014 Notes |
| Merrill Lynch | Underwriter Joint Bookrunner | 2013 Notes |
| Mitsubishi | Underwriter Co-Manager | 2013 Notes |
| Morgan Stanley | Underwriter Joint Bookrunner | 2013 Notes |
| Scotia Capital | Underwriter Co-Manager | 2014 Notes |
| Standard Chartered | Underwriter Co-Manager | 2013 Notes |

57.   The Defendants listed in ¶¶44-56 are referred to as the "Underwriter Defendants."

58.   Petrobras, PGF, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

## C.   EXCHANGE ACT DEFENDANTS

59.   Defendants Foster, Gabrielli and Barbassa (described above in ¶¶31-33) are collectively referred to herein as the "Individual Defendants," and together with Defendants Petrobras and PGF, are collectively referred to herein as the "Exchange Act Defendants."

## V.   JURISDICTION AND VENUE

60.   The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77(k), 77(1), and 77(t), and Sections 10(b), 18 and 20(a) of the

Exchange Act, 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

61. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

62. This Court has personal jurisdiction over each of the Defendants named in this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), and/or N.Y. CPLR § 302. Each of the Defendants either maintains a continuous presence within this District or participated in transactions at issue in this Action within this District.

63. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Petrobras maintains an office in this District, sponsors ADS that are listed on an exchange located in this District, and certain of the acts alleged herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District. All of the registered public offerings at issue in this Action were carried out in this District, 23 debt securities currently outstanding issued by PifCo or PGF are registered with an exchange located in this District, and 19 debt securities issued by PifCo or PGF during the Relevant Period (including the reopening of two prior issues) are registered with an exchange located in this District. Furthermore, a number of the Underwriter Defendants are headquartered in this District.

64. Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets, in committing the acts complained of herein.

## VI.   SUMMARY OF SUBSTANTIVE ALLEGATIONS

### A.   BACKGROUND OF PETROBRAS

65.   Petrobras is an integrated oil and gas company that is the largest corporation in Brazil, accounting for 12% of the country's gross domestic product, and one of the largest companies in Latin America. It was incorporated in 1953 to conduct the Brazilian federal government's hydrocarbon activities. Its common and preferred shares have been traded on the NYSE since 2000 (in the form of ADS). As of December 31, 2013, the Brazilian federal government owned 50.26% of Petrobras' voting shares.

66.   Petrobras' operations account for the majority of Brazil's oil and gas production. Petrobras operates substantially all of the refining capacity in Brazil, and participates in most aspects of the Brazilian natural gas market. It also operates in 17 countries in addition to Brazil, including refining operations in the United States. The Company's activities are organized into six business segments: (1) exploration and production; (2) refining, transportation and marketing; (3) distribution; (4) gas and power; (5) biofuel; and (6) international.

### B.   A BRIBERY SCANDAL ENGULFS PETROBRAS

#### 1.   Operation Car Wash Uncovers An Enormous Bribery Scheme Implicating Top Petrobras Officials

67.   In or about July 2013, Brazilian federal police launched a secret operation code-named "Lava Jato," or "Car Wash." Operation Car Wash focused on a scheme involving a career criminal and money launderer named Alberto Youssef ("Youssef"), and was named after a gas station used by Youssef to launder cash. As the investigation progressed, each new phase was given its own colorful code name, such as "Dolce Vita," "Bidone," "My Way," and "Doomsday," though "Car Wash" is used in the press—and this Complaint—to refer to the total operation. On or about March 20, 2014, after several months of the Operation Car Wash investigation,

Brazilian police arrested Paulo Costa ("Costa"), a director of Petrobras' refining division, based on documentation linking Costa to another person implicated in the money laundering scheme. When the police raided Costa's home, they found a cache of R$380,000 in Brazilian currency, $181,000 in U.S. currency, a $120,000 SUV, and his diary, in which he had written, "Rooting out corruption is the ultimate goal of those who have not yet come to power." Costa apparently has admitted to Brazilian prosecutors that he had received R$1.5 million (approximately $636,000), in connection with Petrobras' purchase of a refinery in Pasadena, Texas (the "Pasadena Refinery").

68.    Costa subsequently agreed to a plea deal from prosecutors, and has testified that he turned Petrobras' refining division into a slush fund for the Workers' Party, a Brazilian political party that has governed at the federal level in a coalition government with several other parties since 2003. Former Petrobras executive Pedro Barusco ("Barusco") has quantified the amount paid to the Party, testifying before a Brazilian Congressional hearing that the Workers' Party received up to $200 million in payments skimmed from Petrobras.

69.    In his testimony, Costa testified that he started inflating budgets for new projects after he was promoted to oversee refining operations nearly a decade ago, accepting bribes equivalent to three percent (3%) of the value of the deals from the Brazilian construction companies that obtained the contracts, and then handing over a portion of the money to the treasurer of the Workers' Party. Similarly, Barusco also testified that he had received bribes from contractors in exchange for inflated contracts as long as 18 years ago.

70.    On April 15, 2014, then-CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's purchase of the Pasadena Refinery and allegations regarding

bribery. As part of her statement, CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts in which Costa could have participated.

71. On or about October 9, 2014, recordings of Costa's testimony were released, in which Costa testified that bribes had been paid in connection with the award of contracts to Transpetro, a segment of Petrobras, implicating Sergio Machado, who was then the director of Transpetro. Machado has since requested unpaid leave.

72. So far at least 23 contractors, including some of the largest construction firms in Brazil, have been implicated in the scandal. Petrobras has announced that its Board has imposed a temporary ban on contracts and bids from at least 23 companies. The blacklist included some of Brazil's biggest contractors, such as Odebrecht S.A., Camargo Correa S.A., and Andrade Gutierrez S.A. In December 2014, Brazil's comptroller general initiated cases against eight construction companies with ties to Petrobras. The comptroller general announced on March 11, 2015, that it had opened cases against ten additional construction firms with Petrobras contracts: Alumni Engenharia, GDK, Promon Engenharia, Andrade Gutierrez, Fidens Engenharia, Sanko Sider, Odebrecht, Odebrecht Óleo e Gás, Odebrecht Ambiental, and SOG Óleo e Gás. The cases may prevent these companies from signing new contracts and may lead to fines and other penalties.

73. Multi-national corporations have also been implicated, including SBM Offshore ("SBM"); Maersk; and two Singaporean companies (Keppel Corp. and Sembcorp Marine). According to Barusco, a friend of his who was formerly an executive of ABB, a Swiss engineering group, was responsible for organizing bribes from SBM, Alusa (a Brazilian construction company), and Rolls-Royce (the British corporation) to politicians and Petrobras executives. Barusco admitted that he laundered approximately $100 million in bribes and that he

personally received at least $200,000 from Rolls-Royce. A network of Swiss bank accounts was used for some of these illegal payments, according to Barusco and documents released by a Brazilian court.

74.     A Brazilian federal court has so far indicted about 40 individuals, including several dozen executives of construction companies, and fourteen persons are in custody while the investigation proceeds. In addition, Brazil's public prosecutor's office has said that it seeks to investigate 49 politicians in connection with the scandal, including the speakers of both houses of the Brazilian Congress.

### 2.     An Independent Member Of The Petrobras Board Votes Against Approval Of The Company's 2013 Financial Statements

75.     Around the time that police began making arrests in the Operation Car Wash scandal, an independent member of the Petrobras Board noticed irregularities in the Company's financial reporting, and specifically its accounting for its refinery projects. On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote, but also disclosing that

> Director Mauro Rodrigues da Cunha *voted against the approval of the Financial Statements* of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) *lack of information and apparent accounting inadequacy of refinery investments.*

(All emphasis added, unless otherwise noted.)

76.     According to a February 5, 2015 BLOOMBERG BUSINESS article, *Petrobras Independent Board Members Oppose CEO Choice*, Cunha, who was nominated to the Board by international funds, rejected the Company's 2013 earnings report because he was given only a few minutes to evaluate complex documents and because the accounting for refineries was inadequate. He complained to a Brazilian regulator, writing, "[t]hey are among the world's most

expensive refineries. . . . I'm not comfortable with the absence of impairment." Although it is not at this time clear whether Cunha thought that impairments were necessary as a result of bribery-related overcharges or some other factor (such as the significant cost overruns that had occurred), the Abreu e Lima refinery and the Complexo Petroquimico do Rio de Janeiro ("Comperj") complex whose accounting Cunha objected to were later revealed to be at the center of the corruption scandal.

### 3. The Abreu e Lima Refinery And Other Major Projects Are Implicated In The Fraud

77.     Records from the Brazilian Federal Audits Court, which is known as the TCU, show that investigators detected widespread overcharging on contracts and irregular tendering practices at major Petrobras projects (including the Abreu e Lima refinery, the biggest single investment project in Petrobras' history) as early as 2009. In a report that was delivered directly to Petrobras' Board, the TCU reported on these practices, criticized Petrobras for obstructing its investigation by waiting until the last day of the investigation to deliver documents, and recommended stopping construction on Abreu e Lima until the irregularities were addressed. Nonetheless, the Petrobras Board overruled this recommendation. "The government doesn't want oversight," said Silvio Sinedino, a Petrobras director representing its employees, adding that important financial information on projects is often provided only on the day of meetings and that government officials try to strong-arm the board.

78.     The TCU continued to flag irregularities in reports on the Abreu e Lima refinery for 2010, 2011, 2012, and 2013. The TCU's findings were "a clear warning sign of bigger problems and likely corruption," Saulo Puttini, one of the auditing officials, told REUTERS. "What's happening now is not a surprise to us at all." The Abreu e Lima refinery has become the most expensive refinery ever built.

### 4. Petrobras' Most Senior Executives Knew Of The Fraud

79. The persons involved in the fraud were senior executives whose knowledge may be imputed to Petrobras. Costa was the former director of the Company's refining division and Barusco was a former high-level manager in the engineering and services division. In addition, Nestor Cervero, the former head of Petrobras' distribution subsidiary, has been arrested for corruption and money laundering for alleged crimes committed between 2006 and 2012. Cervero held various positions at Petrobras and was its international director when the Company purchased a Pasadena, Texas, refinery that is believed to be implicated in the corruption scheme. Prosecutors also are pursuing indictments against Jose Sergio Gabrielli (Petrobras' CEO from 2005 to 2012) as well as former executive Renato Duque (former director of engineering and services).

80. Other top Petrobras executives also were involved in or otherwise knew of the fraud. In 2009, former Petrobras executive Venina Velosa da Fonseca ("Velosa da Fonseca") warned Foster, who was then the head of the Company's energy and gas division (and who is now CEO), about inflated contracts on refinery projects. Velosa da Fonseca was fired in 2009, supposedly for violating the Company's procurement procedures. Velosa da Fonseca said, "I met with [Foster] personally when she was director of the gas and energy unit. At that time, we discussed the matter. I handed over to her the documents about the complaints. . . . Afterward, she had access to these anomalies at the management meetings."

81. Youssef, the smuggler-turned-money-launderer at the center of Operation Car Wash, claims that Brazilian President Dilma Rousseff, who was the chairwoman of the Petrobras board from 2003 to 2010, also knew of the kickbacks. Youssef has been quoted in FORBES as saying that, "[t]he CEO of Petrobras and the President understood the scheme."

82. Prosecutors are currently investigating at least 49 politicians from six political parties, including the heads of both houses of Congress and a former energy minister, in connection with the scheme.

### 5. Petrobras Is Subject To Far-Ranging Investigations

83. On October 27, 2014, Petrobras issued a press release entitled "Internal steps taken by Petrobras in response to 'Lava Jato Operation.'" The Company noted that it was taking certain steps in response to the developing investigation, including

> sign[ing] contracts with two independent investigation companies, a Brazilian and an American, with the aim of examining the nature, extension and impacts of the actions that might have been performed against the Company in the context of what ha[s] been said by former Director Paulo Roberto Costa. These companies will also analyze correlated facts and circumstances that might have material impact over the Company's business.

84. Many other investigations in addition to the criminal investigation have been initiated. On November 24, 2014, before the markets opened, Petrobras issued a press release announcing that the Company was under investigation by the SEC. That same day, news reports circulated that Brazilian police had raided the offices of construction and engineering firms linked to the bribery scheme, seizing documents and carrying out arrests.

85. On December 16, 2014, Brazilian prosecutors announced that they requested that the bank accounts of Defendant Gabrielli--Petrobras' former CEO--and several other former Petrobras executives be frozen.

86. Brazil's securities regulator is investigating whether top Petrobras executives breached their fiduciary duties to protect the Company and its investors. While the regulator did not name specific persons, officials with fiduciary duties would include the CEO, CFO, heads of exploration and production, services and engineering and refining and supply, and members of the board of directors.

22

87. On January 29, 2015, Brazilian prosecutors asserted that the kickback scheme involved at least $800 million in bribes and other illegal funds, though they expected that figure to grow. As of that date, the investigation had targeted more than 230 businesses and resulted in charges against 86 people, as well as the recovery of about $170 million. Just a few days later, on February 5, 2015, the police conducted "Operation My Way," executing 62 warrants to arrest and question suspects, freeze assets, and seize evidence.

### C. PETROBRAS ADMITS THAT THE BRIBERY SCHEME CAUSED ITS ASSET VALUATIONS TO BE INFLATED

88. On November 17, 2014, Petrobras hosted a conference call for analysts and investors. During that call, the Company's CFO, Barbassa, acknowledged that the Company could need to write down asset values to eliminate fraudulently-incurred bribery-related payments that should not have been capitalized. On this call, CEO Foster stated that

> In light of the accusations and investigations of [O]peration Car Wash . . . Petrobras is not able to publish its 3Q14 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements.

> A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th Federal Court of Paraná, revealed information that may lead to possible adjustments in the financial statements of our Company.

> Because of these depositions, therefore, *we need more time to make any possible adjustments to the financial statements.* More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and *we need more time as it is fundamentally important to improve our internal controls.*

89. During the question-and-answer portion of the call, the following exchange occurred between CFO Barbassa, CEO Foster, and an analyst:

> [Analyst]: [I]f we suppose[] . . . [BRL] 5 billion of overprice in the construction of [an asset], how would this be recognized in the balance

sheet of the Company? What are the main line items that would be impacted?

**CFO Barbassa:** The adjustment that could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . . In this case, *this value should be removed from PP&E line item [adjusted] value*[.]

\* \* \*

**CEO Foster:** As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court. This was what the judges are calling evidence, temporary evidence. So, in this case, we have a schedule of activities, and we have deadlines to each one of these activities.

For example, there is definition of criteria to measure the effects of losses caused by fraud. In here, *in the objective, in material fashion, our reference will be the depositions made so far,* the evidence provided that will be submitted to Petrobras by the federal police. *We will then use this evidence to have our write-downs, and to the write-downs year after year* regarding companies A, B, C or D that we might have contracted.

90.     While the exact amount that Petrobras' asset values were inflated by fraud and bribery remains unknown, R\$23 billion (\$8.9 billion) in suspect transactions have been uncovered in the probe so far.

91.     Petrobras' recent financial disclosures provide some insight into the magnitude of the overstatement. On January 27, 2015, Petrobras issued unaudited financial statements for the third quarter of 2014 (which were filed with the SEC as part of a 6-K filing on January 28, 2015). In this filing, Petrobras admitted that the corruption scandal caused the valuations of its assets to be improperly inflated, and that writedowns reflecting the true value of the assets are both necessary and forthcoming, stating that

[T]he Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. However, those costs should not have been capitalized. The Company believes it is necessary to correct the amounts related to the misconduct that were capitalized.

Petrobras did not, however, write down its asset valuations or provide investors with an estimate of the size of the forthcoming writedowns.

92.     Under pressure from its chairman, who is close to Brazil's ruling Workers' Party, Petrobras abandoned an initial decision to include such writedowns in its financial statements for the third quarter of 2014. After initially deciding to take the writedown, the board reversed itself under pressure from Chairman and former Finance Minister Guido Mantega. A source in Brazil has told REUTERS that "[e]ssentially the government didn't want the writedowns to be interpreted as totally related to corruption." The company is expected to take the writedowns in its fourth-quarter audited financial statement, which is due at the end of April.

93.     Petrobras' January 28, 2015 financial statements contained a letter from CEO Foster concerning the corruption scandal and the overstatement of fixed asset values. The letter stated in part that

> As is widely known, Petrobras is facing a unique moment in its history. In March 2014, the "Operation Lava Jato", triggered by the Brazilian Federal Police to investigate alleged money-laundering crimes, reached Petrobras through the arrest of the company's former Downstream Director, Paulo Roberto Costa, on charges of corruption, embezzlement, among other offenses.

> On November 13th, 2014 as a result of the facts and proofs obtained in the "Operation Lava Jato" Petrobras decided to postpone the release of its third quarter 2014 financial results. In short, the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments.

> Consequently we have concluded that it is impracticable to correctly quantify these improperly recognized values, since the payments were made by external suppliers and cannot be traced back to the company's accounting records.

> Given the impracticality of identifying the improper payments correctly, completely and definitely, and the need to rectify this error, Petrobras considered two approaches: (1) the difference between the fair value of each asset appraised, and its book value; (2) the quantification of the price overrun related to illegal

practices, using the information, numbers and dates revealed in the testimonials and plea bargaining of the "Operation Lava Jato".

94.     The letter went on to describe the first of these approaches, namely, comparing the appraisal and book values of the assets on the Company's balance sheet:

> The appraised assets represent R$ 188.4 billion, or approximately 1/3 of the company's total fixed assets (R$ 597.4 billion) and were based on contracts signed between Petrobras and the companies mentioned in "Operation Lava Jato" from 2004 to April 2012.

> The evaluation was carried out by global firms internationally recognized as independent evaluators for 81% of the assets appraised. The analysis of the remaining 19% was conducted by the technical teams of Petrobras, employing full methodological consistency and the same assumptions as the work carried out by the independent evaluators.

> However, the maturity acquired throughout this appraisal process demonstrated to us that this methodology was not an adequate proxy for the unlawful values paid, as this adjustment would also include amounts originated from different situations, which are impossible to be individually quantified, such as changes in the economic and financial variables (exchange rate, discount rate, risk metrics and cost of capital); changes in the estimates of prices and margins of the input; changes in the projections of prices, margins and demand for products sold; changes in equipment and input prices, wages and other correlated costs; as well as project planning deficiencies (engineering and supply).

> The outcome of the appraisals indicated that the assets with fair value below the book value would total R$ 88.6 billion of lower difference. The assets with higher fair value totaled R$ 27.2 billion of higher difference than the book value.

95.     Elsewhere in the January 28, 2015 financial statements, Petrobras discussed a second means of calculating the improper capitalization of amounts attributable to corruption. This approach utilized both (1) an average of 3% of improper payments (mentioned in Costa's deposition to the Brazilian Federal Court) and (2) specific amounts of improper payments mentioned in depositions taken in the course of investigations of the scandal. The resulting estimate of necessary writedowns was R$4.06 billion (approximately $1.26 billion). The 3% figure was identified as merely "a *minimum* percentage of improper payments which increased the amounts charged to the Company." Moreover, the January 28, 2015 financial statements

26

noted that the depositions taken thus far did not provide sufficient detail to justify recording an entry in the Company's books and records—Petrobras quite simply did not know how large the corruption ring had grown. "Additional information regarding the investigations that may arise in the future . . . could result in further adjustments to the financial statements, expansion of the scope for new contracts and companies, or extension of the period of analysis." Of course, expanding the scope of contracts believed to be involved in the corruption ring would lead to an increase of the R$4.06 billion figure—acknowledged by the Company to underestimate the full cost of the bribery scheme—and thereby narrow the gap between this amount and the R$88 billion fair value estimate that was, according to the Company, supported by independent appraisers.

96.     On March 20, 2015, Petrobras announced on its website that

> [A]ccording to the developments into Lava Jato Operation, Petrobras is conducting the necessary analyses to finish and disclose its financial statements, including the individual appraisal of assets and projects procured through goods and services contracts executed with companies mentioned in Lava Jato Operation. These analyses may lead to the recognition of losses and consequent review of Property, Plant and Equipment (PP&E) to be reflected in the results. However, the necessary adjustments are still under analysis . . . .

97.     Thus, while Petrobras has not yet released a definitive account of how much its reported asset values were inflated by fraud, it is clear that the writedowns will ultimately be enormous. The fact that an appraisal of R$188.4 billion in assets resulted in a finding that the value of those assets was overstated by R$61.4 billion establishes that the corruption at Petrobras has had a very significant impact on the Company's balance sheet, and that internal valuation controls were completely ineffective. By way of comparison, Petrobras' total market capitalization was R$229 billion as of the third quarter of 2014, such that an R$61.4 billion writedown would eliminate 27% of the Company's value.

**D.** **PETROBRAS' AUDITOR REFUSES TO APPROVE ITS FINANCIAL STATEMENTS FOR THE THIRD QUARTER OF 2014 DUE TO CONCERNS OVER THE BRIBERY SCHEME**

98. On November 13, 2014, Petrobras disclosed that it would have to delay its earnings results for the third quarter of 2014 because its auditor, PricewaterhouseCoopers ("PwC"), would not approve those statements due to concerns over the impact of the bribery scheme. In response to this partial disclosure of the inadequacy of Petrobras' internal controls and the unreliability of its financial statements, numerous securities issued by Petrobras, PifCo, and PGF dropped sharply in value.

99. The very next day, on November 14, 2014, before trading opened, Petrobras disclosed that it would "release its third quarter 2014 financial statements, *without a review by its Independent Auditors*." Petrobras further noted that:

> In light of the ongoing investigations, it is currently not possible for the Company to determine an estimated date for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

100. On January 27, 2015, Petrobras released its delayed unaudited financial statements for the third quarter 2014. The company acknowledged the need to make revisions to fixed asset values in its financial statements to reflect overpayments tied to past misconduct. However, Petrobras failed to provide any clarity about the magnitude of these adjustments.

101. On January 29, 2015, Moody's announced that it was downgrading all Petrobras debt ratings, including a downgrade of the Company's senior unsecured debt to Baa3 from Baa2, stating "[t]he rating actions reflect concerns about corruption investigations and liquidity pressures that might result from delays in delivering audited financial statements. . . ."

### E.    PETROBRAS MANAGEMENT RESIGNS *EN MASSE*

102.    On February 4, 2015, Petrobras announced that CEO Foster, CFO Barbassa and four other senior executives were resigning from the Company. According to a February 4, 2015 REUTERS article, *Petrobras Changes To Take Time, Even With New CEO*:

> Foster appears to have been pressured by Rousseff and members of her ruling Workers' Party to leave Petrobras because she was too ready to acknowledge the company's problems.
>
> On Jan. 23, Foster and other top executives and board members agreed to write off more than 61.4 billion reais ($23 billion) of investments tainted by corruption and business decisions that didn't pan out, a source with direct knowledge of board actions told Reuters last week.
>
> Four days later, at Rousseff's request, board Chairman and former Finance Minister Guido Mantega vetoed the writedown because it threatened to give the impression that the government and Petrobras were corrupt, the source said, speaking on condition of anonymity.
>
> After that, it seemed it was only a matter of time before Foster would step down or be forced out. On Tuesday, Rousseff asked Foster to stay on to the end of the month until a replacement could be found, according to a government source, who also spoke on condition of anonymity.
>
> But Foster and her closest lieutenants decided not to wait.

103.    Also on February 4, 2015, Petrobras announced that

> Fitch Ratings reviewed Petrobras' debt ratings from BBB to BBB-, and has placed these ratings on Rating Watch Negative. This grade keeps Petrobras as an Investment Grade Company. According to Fitch, this revision reflects the increased uncertainty regarding Petrobras' ability to record an adjustment to its fixed assets in a timely manner, increasing the risk that creditors could accelerate debt payments. This review is also related to the potential impact of the corruption investigations in production growth, since it may affect negotiations with suppliers and equipment availability, delaying delivery of production platforms.

## VII.    PETROBRAS' VIOLATIONS OF ACCOUNTING STANDARDS

104.    Petrobras' improper capitalization of bribery-related payments violated GAAP and IFRS accounting standards in at least three ways. *First*, by improperly capitalizing its bribery-related payments, and then failing to conduct appropriate writedowns, Petrobras

overstated the value of its property, plants and equipment, and the total value of its assets. *Second*, because bribery-related payments should have been treated as operating expenses and deducted from net revenues rather than capitalized and depreciated over time, Petrobras' operating expenses were understated and its net income was overstated. *And third*, because Petrobras calculated depreciation, depletion and amortization ("DD&A") expenses by reference to inflated asset values, Petrobras' DD&A expenses were inflated.

### A.    2009-2010 – US GAAP VIOLATIONS

105.    Petrobras' Form 20-F annual reports for 2009 and 2010 stated that "[t]he audited consolidated financial statements of Petrobras and our consolidated subsidiaries . . . have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

106.    Accounting Standards Codification ("ASC") 360 of US GAAP requires that the carrying values of property, plants and equipment are initially measured at historical cost, including all normal expenditures necessary to bring the asset to a location and condition for its intended use. GAAP does *not*, however, permit general administrative or overhead expenses to be included when capitalizing assets, since these costs do not give rise to any expectations of future profitability. As discussed in ¶¶88-100, however, during and prior to the Relevant Period the Company improperly capitalized bribery-related payments that inflated the costs of the properties it acquired without in any way enhancing the values of the properties. By doing so, Petrobras violated US GAAP.

107.    US GAAP also requires that a Company write down the values of its property, plants and equipment when events indicate that the carrying value of an asset or group of assets may not be recoverable. ASC 360-10-35-17 provides that, "An impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and

exceeds its fair value. . . . An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value."

108.   Petrobras specifically represented that it was, in fact, carrying out reviews of its long-lived assets in order to determine whether writedowns were necessary and appropriate as required by US GAAP. The Company's Forms 20-F for 2009 and 2010 each stated that

> *In accordance with Codification Topic 360-10, management reviews long-lived assets, primarily property, plant and equipment to be used in the business and capitalized costs relating to oil and gas producing activities, whenever events or changes in circumstances indicate that the carrying value of an asset or group of assets may not be recoverable on the bases of undiscounted future cash flows.* The reviews are carried out at the lowest level of assets to which the Company is able to attribute identifiable future cash flows. *The net book value of the underlying assets is adjusted to their fair value using a discounted future cash flows model, if the sum of the expected undiscounted future cash flows is less than the book value.*
>
> The main assumptions of cash flows are: prices based on last strategic plan presented, production curves associated to existent projects comprising the Company's portfolio, operating market costs and investments needed for projects conclusion.

109.   Petrobras knew that the carrying values of property, plants and equipment that had been impacted by bribery were not recoverable because those values had been inflated by fraud. Petrobras, however, failed to conduct appropriate writedowns to reflect this fact. As discussed in ¶¶88-100, the Company has admitted that such writedowns are necessary, although it has not yet disclosed the total extent of the writedowns that it will take.

110.   Petrobras' practice of capitalizing bribery-related payments also caused its operating expenses to be understated, and its net income to be overstated. US GAAP provides that general and administrative expenses should be recorded as expenses, not capitalized, and Petrobras' Forms 20-F for 2009 and 2010 each state that its operating expenses include "general and administrative expenses." Thus, by capitalizing bribery-related payments rather than recording them as operating expenses, Petrobras understated its operating expenses. Because

operating expenses are *subtracted* from net operating revenues in calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

111.    Petrobras' inflated valuations of its property, plants & equipment also caused its DD&A to be overstated. Petrobras' Forms 20-F for 2009 and 2010 each stated that property, plant and equipment are depreciated on a straight line basis. Thus, the DD&A of each property that was affected by the bribery scheme was overstated to the degree that the property's capitalized cost was inflated by bribery. For example, if a particular refinery's cost was inflated by 5% as a result of bribery, then each year's DD&A for that refinery would have been overstated by 5% as well.

**B.     2011-2014 – IFRS VIOLATIONS**

112.    Beginning with fiscal year 2011, Petrobras switched from the use of US GAAP in its financial statements to IFRS. Each of Petrobras' Form 20-F annual reports for 2011, 2012, and 2013 contained a statement to the effect that the Company's "consolidated financial statements have been prepared and are being presented in accordance with the International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board." While Petrobras has not yet published its 2014 Form 20-F, its quarterly financial reports filed on Form 6-K were purportedly prepared under IFRS.

113.    Under IFRS, International Accounting Standard ("IAS") 16 governs the initial measurement of property, plant and equipment capitalization. Certain relevant provisions of IAS 16 are listed below.

    a)    IAS 16-7 provides that "[t]he cost of an item of property, plant and equipment shall be recognized as an asset if, and only if: (a) it is probable

32

that future economic benefits associated with the item will flow to the entity; and (b) the cost of the item can be measured reliably."

b) IAS 16-15 provides that "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost."

c) IAS 16 provides that "[t]he cost of an item of property, plant and equipment comprises: (a) its purchase price, including import duties and non-refundable purchase taxes, after deducting trade discounts and rebates[; and] (b) any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management[.]"

d) IAS 16-19(d) provides that "[e]xamples of costs that are not costs of an item of property, plant and equipment are: administration and other general overhead costs."

114. Petrobras stated in its Form 20-F filings that it was following these rules. Its 2011, 2012 and 2013 Forms 20-F each included language to the effect that, "[p]roperty, plant and equipment, net is stated at the cost of acquisition or construction, which represents the costs incurred for bringing the asset to the condition for operation, adjusted during hyperinflationary periods, less accumulated depreciation and impairment losses."

115. Because repaying bribes to contractors did not give rise to any future economic benefits that would flow to Petrobras, and because the costs of corruption, by their nature, cannot be measured reliably, the costs that Petrobras incurred by repaying bribes did not qualify for recognition as assets under IAS 16-7. Rather, they would fall under the category of general overhead costs, which IAS 16-19(d) specifies may *not* be capitalized.

116.   Furthermore, like US GAAP, IFRS requires that capitalized items of property, plants or equipment be written down where there is evidence that the carrying value of those assets exceeds their fair value (i.e. market value as determined by an appraisal). Relevant portions of IAS 16 include

a)   IAS 16-30: "After recognition as an asset, an item of property, plant and equipment shall be carried at its cost less any accumulated depreciation and any accumulated impairment losses."

b)   IAS 16-31: "After recognition as an asset, an item of property, plant and equipment whose fair value can be measured reliably shall be carried at a revalued amount, being its fair value at the date of the revaluation less any subsequent accumulated depreciation and subsequent accumulated impairment losses. Revaluations shall be made with sufficient regularity to ensure that the carrying amount does not differ materially from that which would be determined using fair value at the end of the reporting period."

c)   IAS 16-32: "The fair value of land and buildings is usually determined from market-based evidence by appraisal that is normally undertaken by professionally qualified valuers. The fair value of items of plant and equipment is usually their market value determined by appraisal."

d)   IAS 16-34: "The frequency of revaluations depends upon the changes in fair values of the items of property, plant and equipment being revalued. When the fair value of a revalued asset differs materially from its carrying amount, a further revaluation is required . . . ."

117.   Regarding revaluation, Petrobras' 2011, 2012 and 2013 Forms 20-F each included language substantially identical to the below:

> *Property, plant and equipment and intangible assets with definite useful lives are assessed for impairment when there is evidence that the carrying amount may not be recoverable.*
>
> Assets related to exploration and development of oil and gas and assets that have an indefinite useful life, such as goodwill, are tested for impairment annually. . . .
>
> *Impairment test comprises a comparison of the carrying amount of a cash generating unit with its recoverable amount. Where the carrying amount of cash generating unit exceeds its recoverable amount, it is considered impaired and is written off to its recoverable amount.* Reversal of previously recognized impairment losses is permitted, except for goodwill.
>
> The recoverable amount of an asset or group of assets is the higher amount between its fair value less cost to sell and its value in use. Value in use is generally used by the Company for impairment testing purposes, except when specifically indicated.

118.   Petrobras violated IAS 16 by failing to write down to their market value those assets whose costs had been inflated by fraud.  Petrobras knew that the fair value of its assets differed materially from their carrying values, and that to the extent its asset values had been inflated by bribery-related payments, that inflation was not recoverable.  Nevertheless, the Company failed to take appropriate writedowns as required by IAS 16-30 and 16-31.

119.   Petrobras' practice of capitalizing bribery-related payments also caused its operating expenses to be understated, and its net income to be overstated.  As discussed above IAS 16-7 prohibits the recognition of general and administrative expenses not likely to cause future economic benefits as capital assets.  Rather, these expenses should be recorded as operating expenses under IAS 7 and included in the reporting entity's cash flow statement. Petrobras' Forms 20-F for 2009 and 2010 each state that its operating expenses include "general and administrative expenses."  Thus, by capitalizing bribery-related payments rather than

recording them as operating expenses, Petrobras understated its operating expenses. Because operating expenses are *subtracted* from net operating revenues in calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

120.    As under US GAAP, Petrobras' inflated property, plant and equipment valuations also caused its DD&A to be overstated. Petrobras' 2011, 2012 and 2013 Form 20-F each contained a statement to the effect that, "[e]xcept for land, which is not depreciated, other property, plant and equipment are depreciated on a straight line basis." Petrobras' inflated valuations of its property, plants & equipment also caused its DD&A to be overstated. Again, the DD&A of each property that was affected by the bribery scheme was overstated to the degree that property's capitalized cost was inflated by bribery. For example, if a particular refinery's cost was inflated by 5% as a result of bribery, then each year's DD&A for that refinery would have been overstated by 5% as well.

# VIII.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS

## A.    FALSE STATEMENTS AND OMISSIONS RELEVANT TO EXCHANGE ACT CLAIMS

### 1.    March 24, 2010 – Press Release And Analyst Conference Call Announcing 2009 Financial Results

121.    On March 24, 2010, the Company issued a press release announcing its financial results for 2009. The Company reported that as of December 31, 2009, it had net property, plant, and equipment of $136 billion, total assets of $200 billion, total costs and expenses of $70 billion (including depreciation, depletion, and amortization of $7.1 billion), and net income of $15.5 billion.

122.    The same day, Petrobras hosted an analyst conference call. As part of his prepared remarks, CEO Gabrielli stated in part (translated from Portuguese):

*In downstream, we invested in 2009 BRL17.3 billion.* Most of the investment, 34% was in fuel quality, which is that we are increasing our capacity for reducing sulfur emission in our gasoline and diesel, trying to meet the environmental requirements of Brazil.

*       *       *

Also, we had a very important cost reduction efforts. We operate in several areas. *We changed our bidding process. We divide the packages and different suppliers in such a way that we could get more competitive bids.* We standardized more of our projects.

Later, CEO Gabrielli discussed the Abreu e Lima refinery with an analyst:

> [Analyst]: [O]n the refining CapEx, *I'd like to understand why for instance the Abreu and Lima refinery is estimated to have a cost that is twice as much the cost of a refinery of similar complexity in the US or Europe?* I might be missing something, so I just wanted to understand if maybe it is related to infrastructure or something else, and maybe even the Maranhão and Ceará refineries seem to be a bit higher in terms of cost versus the international benchmark. So these are my two questions. Thank you.

> **CEO Gabrielli**: First, we have very little flexibility for 2010 because most of the investment for 2010 is already ongoing investments that we have the contracts. We have to deal with this reality which means that we need the capitalization in 2010. That is a very important thing to highlight. We need the capitalization in 2010. If we are going to have a capitalization with the transfer of rights, production rights, or not is another thing, but we need the capitalization for 2010. That is a very important thing.

> We are working right now with the hypothesis that we are going to have the capitalization with the transfer of rights for production from the Government. But we have to consider also the possibility of not to have the transfer. That is the first thing.

> The second thing is on the refinery costs, we are finishing the numbers. If you have the numbers, please tell me because we have not finished it, we do not have them.

> [Analyst]: We got the numbers from what the global press said and from what local reports from what the TCU indicates.

> **CEO Gabrielli**: Ok, if you have them, which is another thing. But we are finishing the numbers and for sure that is something that we have to take into consideration on a qualitative basis. For example, most of the assessment of the cost of refineries is a kind of plug-and-play refinery in

which you go, produce the refinery, and plug to the infrastructure and this is it. This is not our case.

123. The March 24, 2010 press release and analyst conference call statements were false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements. In addition, CEO Gabrielli's statements regarding (1) the Company's property, plant and equipment investments; (2) the Company's bidding processes; and (3) the high cost of the Abreu e Lima refinery were materially false and misleading due to his omission of any mention of the bribery scheme and its effect of inflating Petrobras' costs.

### 2. May 20, 2010 – 2009 Form 20-F

124. On May 20, 2010, Petrobras and PifCo filed the 2009 Form 20-F, which set forth substantially similar figures as in the March 24, 2010 press release. The 2009 Form 20-F also included the following certification signed by CEO Gabrielli that Petrobras' internal controls over financial reporting were effective:

I, José Sérgio Gabrielli de Azevedo, certify that:

1. I have reviewed this annual report on Form 20-F of Petróleo Brasileiro S.A. – PETROBRAS (the "Company");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

38

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

125. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras'

stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 3. May 27, 2010 – Press Release Announcing Financial Results For The First Quarter Of 2010

126. On May 27, 2010, Petrobras issued a press release announcing its financial results for the first quarter of 2010. The Company reported that as of March 31, 2010, it had net property, plant, and equipment of $141 billion, total assets of $204 billion, total costs and expenses of $21.3 billion, including depreciation, depletion, and amortization of $2.0 billion, and net income of $4.3 billion.

127. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements.

### 4. August 24-25, 2010 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2010

128. On August 24, 2010, Petrobras issued a press release announcing its results of operations for the second quarter of 2010. The Company reported that as of June 30, 2010, it had net property, plant, and equipment of $147 billion, total assets of $211 billion, total costs and expenses of $23.4 billion including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.2 billion.

129.    In a letter to shareholders and investors released together with the August 24, 2010 press release, CEO Gabrielli stated:

> We are passing through an exceptional time in our history. In the first six months of 2010, *we invested a record amount of U.S.$19,387 million, 35,8% more than the same period last year, primarily allocated to increasing oil and gas production capacity, modernizing and expanding our refineries and reorganizing our interests in the petrochemical sector*, particularly in regard to Braskem.
>
> This substantial increase in capital expenditures is a reflection of the number and quality of projects in our investment portfolio, as reflected in the expansion of our strategic business plan. In June, we released the 2010-2014 Business Plan, in which we project investment spending of U.S. $224 billion, or approximately U.S. $45 billion per year.

130.    On August 25, 2010, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the six-month period ended June 30, 2010, which set forth substantially similar figures as in the August 24, 2010 press release.

131.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements. In addition, CEO Gabrielli's statements in the shareholder letter were false and misleading due to his failure to mention bribery-related expenses as one of the factors responsible for the growth of the Company's capital expenditures.

### 5.    November 23, 2010 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2010

132.    On November 23, 2010, Petrobras issued a press release announcing its results of operations for the third quarter of 2010. The Company reported that as of September 30, 2010, it

41

had net property, plant, and equipment of $206 billion, total assets of $298 billion, total costs and expenses of $25.1 billion including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.7 billion.

133. On November 24, 2010, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the nine-month period ending September 30, 2010 with figures substantially similar to those set forth in the Company's November 23, 2010 press release.

134. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements.

6. **March 15, 2011 – Press Release Announcing 2010 Financial Results**

135. On March 15, 2011, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2010. The Company reported that as of December 31, 2010, it had net property, plant, and equipment of $219 billion, total assets of $309 billion, total costs and expenses of $96 billion including depreciation, depletion, and amortization of $8.5 billion, and net income of $19.2 billion.

136. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the

bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements.

### 7. May 24, 2011 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2011

137. On May 24, 2011, Petrobras issued a press release announcing its results of operations for the first quarter of 2011. The Company reported that as of March 31, 2011, it had net property, plant, and equipment of $230 billion, total assets of $331 billion, total costs and expenses of $25.2 billion including depreciation, depletion, and amortization of $2.3 billion, and net income of $6.5 billion.

138. On May 26, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2011, which set forth substantially similar figures as in the May 24, 2011 press release.

139. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements.

### 8. May 26, 2011 – 2010 Form 20-F

140. On May 26, 2011, Petrobras and PifCo filed the 2010 Form 20-F, which set forth substantially similar figures as in the March 15, 2011 press release. The 2010 Form 20-F also included certifications substantially similar to those described in ¶124, certifying that Petrobras' internal controls over financial reporting were effective.

141.     These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 9.     June 6, 2011 – 2010 Sustainability Report

142.     On or about June 6, 2011, Petrobras published its 2010 Sustainability Report on its website. This document stated that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that "[t]his company does not use child or slave labor, it is not involved in prostitution or sexual exploitation of children or adolescents, *and it is not involved in corruption*."

143.     These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and was involved in a multi-billion dollar bribery scheme.

### 10.     August 14, 2011 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2011

144.     On August 14, 2011, Petrobras issued a press release announcing its results of operations for the second quarter of 2011. The Company reported that as of June 30, 2011, it had net property, plant, and equipment of $247 billion, total assets of $351 billion, total costs and expenses of $31.2 billion including depreciation, depletion, and amortization of $2.5 billion, and net income of $6.6 billion.

145. On August 25, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2011, which set forth substantially similar figures as in the August 14, 2011 press release.

146. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements.

## 11. November 22, 2011 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2011

147. On November 22, 2011, Petrobras issued a press release announcing its results of operations for the third quarter of 2011. The Company reported that as of September 30, 2011, it had net property, plant, and equipment of $220 billion, total assets of $309 billion, total costs and expenses of $31.5 billion including depreciation, depletion, and amortization of $2.6 billion, and net income of $3.9 billion.

148. Also on November 22, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2011, which set forth substantially similar figures as in the November 22, 2011 press release.

149. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the

bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements.

### 12. February 3, 2012 – Prospectus Supplement Offering The 2012 Notes

150. On February 3, 2012, PifCo filed a prospectus supplement on Form 424B2 in connection with the offer and sale of the 2012 Notes. This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo 2010 Form 20-F, filed on May 26, 2011; and (2) the Petrobras Report on Form 6-K filed with the SEC on November 22, 2011, containing financial information for nine-month period ending September 30, 2011. As discussed in ¶¶140-41; 147-49, both of these documents contained material misstatements and omissions.

### 13. February 28, 2012 – Press Release And Form 6-K Announcing 2011 Financial Results

151. On February 28, 2012, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2011. The Company reported that as of December 31, 2011, it had net property, plant, and equipment of $182 billion, total assets of $319 billion, total costs and expenses of $19 billion including depreciation, depletion, and amortization of $10.5 billion, and net income of $20 billion.

152. On February 29, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for 2011, which set forth substantially similar figures as in the February 28, 2012 press release.

153. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the

bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements.

### 14.    April 2, 2012 – 2011 Form 20-F

154.    On April 2, 2012, Petrobras and PifCo filed the 2011 Form 20-F, which set forth substantially similar figures as in the February 28, 2012 press release. The 2011 Form 20-F also included certifications substantially similar to those described in ¶124, signed by Petrobras CEO Foster and CFO Barbassa, as well as PifCo CEO Oliveira and CFO Tinoco, certifying that Petrobras' internal controls over financial reporting were effective.

155.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 15.    May 15, 2012 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2012

156.    On May 15, 2012, Petrobras issued a press release announcing its results of operations for the first quarter of 2012. The Company reported that as of April 30, 2012, it had net property, plant, and equipment of $194 billion, total assets of $338 billion, total costs and expenses of $4.7 billion including depreciation, depletion, and amortization of $2.7 billion, and net income of $5.3 billion.

157. On May 17, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2012, which set forth substantially similar figures as in the May 15, 2012 press release.

158. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery-related payments to contractors as others in the recorded value of certain assets; (2) Petrobras' stated depreciation, depletion and amortization expenses were also overstated as a result of the bribery-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery-related asset overstatements.

### 16. June 21, 2012 – 2011 Sustainability Report

159. On or about June 21, 2012, Petrobras published its 2011 Sustainability Report on its website. This document included the following statements about the anti-corruption policies of the "Petrobras System," i.e., Petrobras and its subsidiaries, affiliates, and associated companies (among others):

> *The Petrobras System refuses any practice that involves corruption or bribery*, and uses management instruments such as the Competition Behavior and Good Practice codes, in addition to following the Code of Conduct of the High Federal Administration, the application of which is inspected by the Presidency of the Republic's Ethics Commission.

> \* \* \*

> According to its Code of Ethics' guidelines, the Petrobras System makes no contributions to political parties or to candidates for elective offices. The company's business requires transparency in actions and positions, particularly regarding the information published to society.

> \* \* \*

> To ensure transparency in its relations with the Government, *Petrobras System's Code of Ethics determines the company will not make contributions to political parties or to campaigns of candidates to elected office. It also emphasizes that it refuses any act of corruption and bribery* and that it has formal control and